**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Maurice H. FRIEDMAN, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Manuel JACOBS, Defendant-Appellant.**

**Nos. 25844, 25997.**

United States Court of Appeals, Ninth Circuit.

June 8, 1971.

Rehearing Denied in No. 25997 July 16, 1971.

Peter J. Hughes (argued), Sheela, Lightner, Hughes & Castro, San Diego, Cal., for appellant Friedman.

Burton Marks (argued), Beverly Hills, Cal., for appellant Jacobs.

David R. Nissen, Asst. U. S. Atty., (argued), Robert L. Meyer, U. S. Atty., Los Angeles, Cal., for appellee.

Before CHAMBERS, DUNIWAY and TRASK, Circuit Judges.

DUNIWAY, Circuit Judge:

After a lengthy jury trial codefendants Friedman and Jacobs were found guilty on six and five counts, respectively, of a multicount indictment. They appeal, alleging numerous errors. We affirm.

Appellants had previously been convicted, along with others, for participating in an organized scheme to cheat for profit in card games played at the Friars Club in Beverly Hills, California. See United States v. Roselli, 9 Cir., 1970, 432 F.2d 879. During the trial of that case (referred to as the *Friars Club* case), a secret grand jury transcript was found on the counsel table of the defense. It contained the testimony of a witness before the grand jury that had returned the indictments in that case. The court had not authorized access to the transcript by defense counsel.

In the case before us, eleven defendants were indicted on a total of 25 counts. All but three received severances, and of the three who went to trial together, one, Harold Rosenthal, was granted a motion for acquittal at the close of the prosecution's case. The other two, Friedman and Jacobs, are the present appellants. Friedman was con-

victed on the following counts: *Count 1:* conspiracy (18 U.S.C. § 371); *Count 5:* contempt (18 U.S.C. § 401) for violating F.R.Crim.P. 6(e) by possessing and disclosing unreleased grand jury transcripts; *Counts 13 and 14:* receiving and concealing stolen government property (18 U.S.C. §§ 641, 642) on two occasions; *Count 17:* obstruction of justice (18 U.S.C. § 1503) by use of unreleased grand jury transcripts; *Count 19:* obstruction of justice (18 U.S.C. § 1503) by attempting to influence prospective witness Corenson; *Count 23:* perjury (18 U.S.C. § 1621) during the *Friars Club* trial. Jacobs was convicted on the following counts: *Count 1:* conspiracy (18 U.S.C. § 371); *Count 6:* contempt (18 U.S.C. § 401) for violating F.R.Crim.P. 6(e) by possessing and disclosing unreleased grand jury transcripts: *Counts 15 and 16:* receiving and concealing stolen government property (18 U.S.C. § 641) on two occasions; *Count 18:* obstruction of justice (18 U.S.C. § 1503) by use of unreleased grand jury transcripts.[1]

Each appellant was sentenced to three years imprisonment on each count, the terms to run concurrently with one another but consecutively to the sentences imposed in the *Friars Club* case.

A. *Jacobs' contention that there was insufficient evidence to show that he participated in the alleged conspiracy.*

 Count 1 of the indictment charged a conspiracy whose aims were the unauthorized obtaining of recorded and unreleased secret grand jury testimony, providing that testimony to various defendants and defense counsel in the *Friars Club* case, attempt by those defendants to use the testimony to influence certain witnesses at the *Friars Club* trial, and use of the testimony by those defendants and their counsel in

---

1. There were other counts against both Friedman and Jacobs. *Count 11,* (Friedman), and *Count 12,* (Jacobs) were dismissed on the government's motion. Two counts against Friedman, 24 and 25, and one against Jacobs, were dismissed on their motions. A mistrial was declared as to two other counts against Jacobs, 21 and 22.

preparing for the trial. Count 1 named eight co-conspirators: Raymond Cohen, T. W. Richardson, Harold Rosenthal, Milton Rosenthal, Nathan Ross, William Schwartz, Friedman, and Jacobs.[2]

Count 1 listed 15 overt acts, and neither Friedman nor Jacobs claims that the evidence was insufficient as to any of those overt acts. Jacobs' claim is that in his activities he dealt only with one of the other co-conspirators, Schwartz; that there was insufficient evidence for the jury to find that Jacobs either knew of the conspiracy or intended to further its common aims; and that if he was engaged in any conspiracy, it was a smaller conspiracy with Schwartz and not the large, all-encompassing conspiracy charged in Count 1.

The factual background can be briefly summarized. In October 1967, while the grand jury investigation in the *Friars Club* case was in progress, Raymond Cohen was hired as office manager of Scribe Reporting Service (Scribe). The grand jury returned its indictment on December 21, 1967, and Cohen served as Scribe's office manager until April 1968. Scribe reported and prepared transcripts of the grand jury proceedings in the *Friars Club* case under contract with the United States. Scribe prepared an original transcript and two copies. The original and one copy were sent to the United States Attorney's office, and the second copy remained at Scribe's office. All copies remained the property of the United States; Scribe's contract with the government so provided.

William Schwartz was an acquaintance of Cohen, who told Schwartz that he had access to the copy of the *Friars Club* grand jury transcript kept at Scribe's office. Sensing potential profit, Schwartz asked Cohen to pass the transcripts to him. Through the intermediation of Milton and Harold Rosenthal and T. W. Richardson, Schwartz got

in touch with Friedman, who indicated an interest in obtaining copies of the transcripts. Thereafter copies of the transcripts passed through Cohen and Schwartz to Friedman over a period extending from January 26 through about the third week in February, 1968. Following the last transfer of transcripts to Friedman, Schwartz had no further dealings with Friedman. Several weeks after Schwartz stopped dealing with Friedman, Schwartz met Jacobs and arranged to pass *Friars Club* transcripts to him. At a later meeting Jacobs asked Schwartz for the testimony of four or five named grand jury witnesses, which Schwartz subsequently gave him. About a week later, they met again; Jacobs requested additional transcripts by name, and Schwartz delivered them. Jacobs paid Schwartz several thousand dollars for the transcripts. Jacobs' account differs, but the jury resolved the conflict against him. See Glasser v. United States, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680.

Jacobs' argument is that Schwartz sold transcripts to Friedman for about a month, ending late in February; shortly thereafter, Schwartz sold transcripts to Jacobs; Friedman had no dealings with Schwartz during or after the period when Jacobs was dealing with Schwartz. Thus Jacobs could be guilty only of dealing with Schwartz. However, there was sufficient evidence from which the jury could have found, as it did, that Jacobs was a party to the conspiracy alleged in Count 1.

Jacobs shared the common aims of the conspiracy, and his actions intentionally advanced those aims. By obtaining copies of the transcripts, he assisted in disseminating the secret grand jury testimony. Because he was a defendant in the *Friars Club* case, his request to Schwartz for the transcripts and his receipt of the transcripts furthered the aim of providing the secret testimony to

---

2. Of the co-defendants charged with conspiracy, 4 pled guilty to one or more counts, and each was granted a severance; one was severed because of illness.

various defendants in that case. We have found no direct testimony stating that Jacobs or his counsel actually used the transcripts in preparing for the trial. However, Jacobs himself testified that he showed the transcripts to his attorney, Charles Lynberg. Both Lynberg and his partner, William Marshall Morgan, who represented Jacobs at the *Friars Club* trial, testified that they at some time possessed the transcripts. Moreover, Morgan, Friedman and Friedman's counsel Grant Cooper, all testified that Cooper obtained copies of the transcripts from Morgan. From this testimony and from Schwartz' account of his delivery of the transcripts to Jacobs and Jacobs' payment of several thousand dollars for them, the jury was entitled to infer that Jacobs did use the transcripts to assist in his defense and that of others, or at least, that he had obtained them for that purpose.

The more difficult question is whether Jacobs had any knowledge of the larger conspiracy. He dealt with Schwartz, who was a co-conspirator. Schwartz testified that on two occasions during their dealings, Jacobs asked him whether Friedman had obtained copies of the transcripts. Schwartz said that on both occasions he lied to Jacobs by answering in the negative. Schwartz stated, however, that on the second occasion Jacobs insisted repeatedly that Schwartz had passed transcripts to Friedman, but Schwartz continued in his denial. Jacobs himself testified that he asked Schwartz, at their first meeting, whether anyone else had copies of the transcripts and that Schwartz said no.

We think the jury could have inferred, from Schwartz' account of Jacobs' insistent behavior, that Jacobs then in fact had knowledge of the prior Schwartz-Friedman dealings. Moreover, the fact that Jacobs asked Schwartz for the testimony of several grand jury witnesses by name suggests that Jacobs had some knowledge of the grand jury proceedings; the jury could infer that he obtained that knowledge from someone who had seen the transcripts—for instance, Friedman.

Thus the jury could properly have found that, at the time of his own dealings with Schwartz, Jacobs knew not only that Schwartz had obtained access to the transcripts, but also that Schwartz had previously passed some of them to Friedman. Through his own dealings with Schwartz, Jacobs was advancing the aims of the conspiracy. By taking the transcripts from Schwartz and paying Schwartz for them, Jacobs *agreed* with Schwartz, one of the co-conspirators, to advance those same aims. The jury could infer that Jacobs made that agreement with knowledge that at least one other person—Friedman—was involved in similar transactions with Schwartz. On the basis of these facts, the jury was entitled to find that there was only one conspiracy to disseminate the transcripts, and that Jacobs was part of it. See Blumenthal v. United States, 1947, 332 U.S. 539, 556–558, 68 S.Ct. 248, 92 L.Ed. 154.

 If we assume that Jacobs did not know that anyone other than himself, Friedman, and Schwartz was involved in disseminating the transcripts, or that if he did know that others were involved, he did not know who they were, the jury could nevertheless find that Jacobs was a co-conspirator. For it is well established that one can be a party to a conspiracy even though he does not know of the existence or identity of all his co-conspirators, and even though he does not participate in all of their acts. Blumenthal v. United States, 1947, 332 U.S. 555, 557, 68 S.Ct. 248; Esco Corporation v. United States, 9 Cir., 1965, 340 F.2d 1000, 1006; Fernandez v. United States, 9 Cir., 1964, 329 F.2d 899, 905 n. 12; Lile v. United States, 9 Cir., 1958, 264 F.2d 278, 281; Leyvas v. United States, 9 Cir., 1958, 264 F.2d 272, 274; Marino v. United States, 9 Cir., 1937, 91 F.2d 691, 696. Once the conspiracy exists, co-conspirators of whom a party to the conspiracy is unaware can bind him by their actions. Hernandez

v. United States, 9 Cir., 1962, 300 F.2d 114, 122; Marino v. United States, *supra*, 91 F.2d at 696.

### B. *Jacobs' contention that his motions for a severance were improperly denied.*

■ Before and during the trial, Jacobs moved for a severance of his case, under Rule 14, F.R.Crim.P. That Rule states, in relevant part:

"If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. * * *"

The trial judge denied the motions. Jacobs' argument is, essentially, that the trial was a "mass conspiracy trial" in which multiple defendants were charged with unrelated offenses and tried together on the pretext of a conspiracy to which all co-defendants were allegedly parties. As a result, Jacobs continues, "a vast amount of material was admitted which was irrelevant, immaterial, and hearsay" as to him, thereby gravely prejudicing him.[3]

■ The conspiracy count in the indictment was not merely pretextual. As we have seen it was premised upon evidence sufficient to support a jury finding that the conspiracy existed and that Jacobs was part of it. The evidence was probative of the existence of a conspiracy, of the identity of its participants, and of their activities. Evidence of such activities was admissible as against Jacobs and he was not improperly prejudiced by it.

Almost all the specific pieces of evidence that Jacobs labels as prejudicial were therefore properly admissible against him. Only two specific objections made by Jacobs bear additional comment.

■ First: Schwartz described a conversation between himself, Friedman, Jacobs, and Richard Sherman, a lawyer. The conversation occurred at Sherman's office, after Schwartz had been arrested in connection with the grand jury transcripts. Schwartz testified that either Jacobs or Friedman told him that if he did not plead guilty but instead went to trial, his family would be adequately taken care of. In addition, Schwartz testified that Friedman had assured him that Milton Rosenthal would not plead guilty and would not give evidence to the government. Arguing that Schwartz' testimony should have been excluded, Jacobs claims that failure to exclude it prejudiced Jacobs so gravely as to require a severance.

Jacobs' argument is that this conversation took place after the conspiracy had been terminated and that Schwartz' account of it was therefore inadmissible hearsay as against Jacobs. We assume, *arguendo*, that the conspiracy had been terminated before the conversation occurred. We nevertheless find the admission of Schwartz' account of the conversation to be proper. Jacobs was a participant in the conversation. Government counsel stated that Schwartz' testimony was not offered for the purpose of proving the facts asserted by the declarants. Accordingly, the judge admonished the jury that Schwartz' testimony was offered against Friedman and Jacobs "for the limited purpose of showing, if it does, a consciousness of guilt and knowledge." Relevant testimony relating an out-of-court conversation is admissible as evidence of consciousness of guilt, even though it might be inadmissible hearsay if used to prove the truth of the facts asserted. *Cf.* United States v. Freundlich, 2 Cir., 1938, 95 F.2d 376,

---

3. Despite his assertion that the conspiracy allegation was a pretext as to him, Jacobs does not now argue that the joinder of offenses and defendants was improper under Rule 8, F.R.Crim.P. Nor does he repeat the arguments he made before the trial court in support of his motion for a severance under Rule 14. Thus we need not answer these arguments.

378–379 (L. Hand, J.); United States v. Culotta, 2 Cir., 1969, 413 F.2d 1343, 1346.

Second: Jacobs finds prejudicial the introduction of evidence of numerous telephone calls made by Friedman and by Harold Rosenthal. They were overt acts committed by a conspirator pursuant to the conspiracy, and as such were admissible against Jacobs once his participation in the conspiracy was shown.

We conclude that the trial judge did not abuse his discretion in denying Jacobs' motions for severance. United States v. Cozzetti, 9 Cir., 1971, 441 F.2d 344; United States v. Roselli, 9 Cir., 1970, 432 F.2d 897, 901, and cases cited.

C. *Friedman's contention that the counts against him were improperly joined.*

Friedman argues that the charges that he committed perjury at the *Friars Club* trial (Count 23) and that he attempted to influence the testimony of witness Corenson (Count 19) were "logically, factually, and legally distinct" from the other charges against him, all of which concerned the grand jury transcripts. Friedman claims that the joinder of these charges against him is reversible error.

We first treat Friedman's contention as an assignment of error under Rule 8(a) and (b), F.R.Crim.P.

In applying Rule 8, Rule 14 must be kept in mind. The availability of Rule 14 as a remedy for prejudice that may develop during the trial permits Rule 8 to be broadly construed in favor of initial joinder, both of offenses and of defendants. Other courts have so construed Rule 8, for that reason. Tillman v. United States, 5 Cir., 1969, 406 F.2d 930, 934; Williams v. United States, 8 Cir., 1969, 416 F.2d 1064, 1069; Haggard v. United States, 8 Cir., 1966, 369 F.2d 968, 973; *cf.* King v. United States, 1 Cir., 1966, 355 F.2d 700, 703–704. And see 8 Moore's Federal Practice ¶¶ 8.02 [1], 14.02 [1] (2d ed. 1970). We have noted that a substantial public interest supports joint trials. Parker v. United States, 9 Cir., 1968, 404 F.2d 1193, 1196; Bayless v. United States, 9 Cir., 1967, 381 F.2d 67, 72. Accordingly, we agree with the courts mentioned above that Rule 8 is to be broadly construed in favor of initial joinder. We agree, moreover, that misjoinder under Rule 8 is an issue of law. In this respect it is unlike prejudicial joinder under Rule 14, which raises only the issue whether the trial judge abused his discretion. Tillman v. United States, *supra,* 406 F.2d at 933 n. 5; Haggard v. United States, *supra,* 369 F.2d at 972–973; 8 Moore's Federal Practice, ¶ 14.-02 [1] (2d ed. 1970). *Cf.* Metheany v. United States, 9 Cir., 1966, 365 F.2d 90, 95 & n. 5. The question under Rule 8, therefore, is whether, as a matter of law, the joinder of the various counts against Friedman and others in the single indictment violated the standards of Rule 8 broadly construed.

Preliminarily, it does not matter that the offenses charged in Counts 19 and 23 are not "of the same or similar character" as those charged in the other counts. We covered that ground thoroughly in Roselli v. United States, *supra,* 432 F.2d at 898, where we said that "even dissimilar charges may be joined against multiple defendants if they arise out of the same series of transactions constituting an offense or offenses."

The government's theory, as set out in its brief, is as follows:

"The indictment accuses Friedman, Jacobs, and other defendants in the Friars Club case, and their associates, of conspiracy to commit several types of offenses to avoid conviction in the Friars Club case. The substantive counts of the indictment charge the commission of those offenses which were the object of the conspiracy.

"The indictment charges, and the evidence showed, that the obtaining of the transcripts was not an isolated offense unconnected with the others.

The defendants did not purchase the embezzled transcripts in order to add them to their libraries. As the charges and proof indicated, the transcripts were not obtained as an end in itself, but for the purpose of assisting the defendants to escape conviction in the Friars Club case. Thus, it was charged and proved that they not only obtained the transcripts, but used them to determine what testimony the witnesses had given and then attempted to influence these witnesses to help themselves. They also used the transcripts to ascertain what fictitious defenses could be fabricated. To establish the fictitious defenses false testimony was employed. The acts committed by the defendants in their attempt to escape conviction constituted one or more of the several crimes with which they are charged. * * * Thus, * * * the indictment * * * alleges a closely related series of acts all done in pursuit of a single goal."

In finding the initial joinder proper, the trial judge adopted the government's view of the case. We too find the government's argument convincing. " 'Transaction' is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." Moore v. New York Cotton Exchange, 1926, 270 U.S. 593, 610, 46 S.Ct. 367, 371, 70 L.Ed. 750. See also Cataneo v. United States, 4 Cir., 1948, 167 F.2d 820, 822–823, citing Moore. Williamson v. United States, 9 Cir., 1962, 310 F.2d 192, 197 n. 16, applies here. *Cf.* Scheve v. United States, 1950, 87 U. S.App.D.C. 289, 184 F.2d 695, 696–697. This case resembles United States v. Roselli, *supra*, 432 F.2d at 898–901, where we declined to find error under Rule 8.

 It also resembles *Roselli* in another respect. We noted in *Roselli* that Rule 52(a), F.R.Crim.P., applies to misjoinder. 432 F.2d at 901. Applying Rule 52(a) here, we reach the same con-clusion as we did in *Roselli:* "If we are wrong in our interpretation of Rule 8(b), and joinder of [Counts 19 and 23] with the others was improper under the rule, we would hold the error harmless." *Id.* The trial judge's instructions to the jury clearly delineated the various charges, and adequately emphasized that the jury must consider each charge separately. We think it highly unlikely that the jury might inadvertently have utilized evidence relevant only to the transcript counts in deliberating on Counts 19 and 23. And, of course, we presume that the jury did not wilfully disobey the judge's instructions. Vitello v. United States, 9 Cir., 1970, 425 F.2d 416, 422–423, and cases cited.

If we treat Friedman's claim as being based on Rule 14, rather than Rule 8, we find it lacking in merit. Friedman does not point to any specific source of prejudice attributable to the joinder. His contention is that a general "prejudicial interaction" arose between Counts 19 and 23 and the transcript counts simply because the same jury considered both sets of counts at one deliberation. Given the readily distinguishable nature of the various counts, we think that Friedman must show more if he is to convince us that his substantial rights have been affected.

D. *Jacobs' and Friedman's contentions that the trial judge improperly instructed the jury on the unanimity of the verdict.*

 Each appellant cites Andres v. United States, 1948, 333 U.S. 740, 748, 68 S.Ct. 880, 884, 92 L.Ed. 1055, for the proposition that "[u]nanimity in jury verdicts is required where the Sixth and Seventh Amendments apply." Each appellant argues that the instructions given by the trial judge failed to require that, in order to convict on the conspiracy charge, the jury must unanimously find that all the conspirators agreed on at least one specific unlawful object of the conspiracy.

The judge gave the following instruction concerning the conspiracy count:

"To convict any defendant of the offense of conspiracy, the Government must prove, beyond a reasonable doubt, the existence of a conspiracy to commit at least one of the [enumerated substantive offenses]. It is not necessary that the proof show a conspiracy to commit all of the said [substantive] offenses.

"The government must also prove, beyond a reasonable doubt, that the defendant in question became wilfully a member of the conspiracy, and that during the existence of the conspiracy, at least one of the overt acts was committed by one or more of the members of the conspiracy in furtherance of the objects of the conspiracy. It is not necessary that the proof show the commission of all of the overt acts alleged, or more than one of them."

In addition, the judge gave the following instructions to the jury near the end of his charge:

"Each verdict that you reach must represent the considered judgment of each juror. In other words, it must be a unanimous verdict. * * *

"So when you have reached unanimous agreement as to your verdict on each and all of the matters submitted to you, you will have your foreman fill in the verdict forms, date and sign them to state the verdicts upon which you have unanimously agreed, and then return with them to this courtroom."

Friedman and Jacobs requested that the following instruction be given:

"The conspiracy charged by the Government in this case alleges that it was an agreement to commit a violation of not one but seven different criminal statutes. Before you can find the defendant MAURICE H. FRIEDMAN (the defendant whose guilt you are specifically considering) guilty you must find not only that said defendant actually entered an unlawful agreement with one or more of the specifically named co-defendants but you must also unanimously agree as to which specific unlawful object the agreement was directed. Even though you find that such defendant entered an unlawful agreement with one or more of the other specifically named defendants and even though all of the jurors are convinced that such agreement had as its object the commission of at least one of the unlawful acts alleged in the Indictment, nevertheless you can not find such defendant guilty unless you are in unanimous agreement as to at least one of the specifically alleged unlawful objects."

Appellants argue that because this instruction was not given we cannot know whether the jury unanimously agreed on whether a conspiracy to commit a specific offense did in fact exist, and that, therefore, reversal is required.

 We think the instructions given by the judge were adequate and that his refusal to give the unanimity instruction requested by appellants was not error. The judge clearly instructed the jury that each of their verdicts must be unanimous, including the verdicts on the conspiracy count. We cannot swallow appellants' argument that, under the instructions given, the jury could have unanimously found appellants guilty of conspiracy, yet not have unanimously agreed on what the conspiracy was. The plain and unequivocal import of the judge's instructions is that a conspiracy to commit at least one of the alleged offenses must be shown, that each defendant must be found to be a participant in that conspiracy, and that each of these findings must be unanimous if the jury is to convict. Vitello v. United States, 9 Cir., 1970, 425 F.2d 416, 419, 422–423.

In any case, the jury's verdict indicates that the jury *was* unanimous in agreeing on at least one specific object of the conspiracy. In Counts 13 and 14 the jury found Friedman guilty of violating 18 U.S.C. § 641 on two occasions, by receiving, concealing and retaining the grand jury transcripts. In Counts 15 and 16 they found Jacobs guilty of violating section 641 on two other occa-

sions. As we have shown, *supra,* the evidence permitted the jury to find that Friedman, Jacobs, and the other conspirators conspired to disseminate the transcripts to the defendants in the *Friars Club* case, also in violation of section 641. In light of the verdicts on Counts 13 through 16, we think it almost certain that the jury found just such a conspiracy. Absent contrary indications, we think Friedman and Jacobs have failed to show any prejudice through lack of a more particularized unanimity instruction.

Jacobs urges two additional variations on the lack-of-unanimity argument. He complains that the instructions corresponding to Counts 6 and 18 were phrased in the disjunctive, and that the jury was not expressly told that they must unanimously agree whether, for example, Jacobs "corruptly influence[d], obstruct[ed], or impede[d], or endeavor[ed] to influence, obstruct, or impede the due administration of justice" (Count 18). For the reasons already discussed, this was not error.

E. *Jacobs' and Friedman's contentions that their attorney-client privileges were violated.*

Among the witnesses called by the government at trial were Baird and Cooper, co-counsel for Friedman in the *Friars Club* case, and Morgan, counsel for Jacobs in that case. All three answered government counsel's questions over objections by Friedman and Jacobs. Friedman and Jacobs now claim that admission of this testimony violated their respective attorney-client privileges.

▮ We need not decide whether or not state law provisions govern the application of the attorney-client privilege in federal criminal cases. See Rule 26, F.R.Crim.P. Under both the California Evidence Code and the decisions of this court, the privilege is limited in scope to confidential communications between client and attorney. Calif.Evid.Code §§ 917, 952, 954; Hett v. United States, 9 Cir., 1966, 353 F.2d 761, 764; United States v. Judson, 9 Cir., 1963, 322 F.2d 460, 462–463; Himmelfarb v. United States, 9 Cir., 1949, 175 F.2d 924, 939; *cf*. Baird v. Koerner, 9 Cir., 1960, 279 F.2d 623, 628–29. Moreover, concededly confidential attorney-client communications lose their privileged character when they concern contemplated unlawful acts by the client. Calif.Evid.Code § 956; Hett v. United States, *supra*, 353 F.2d at 764.

▮ The testimony given by Cooper and Morgan did not violate the confidentiality privileges of their respective clients, Friedman and Jacobs. None of the testimony given by Morgan touched upon communications that might have passed between him and Jacobs.[4] As for Cooper, none of his testimony during the government's case-in-chief mentioned any communications between him and Friedman. When called as a government rebuttal witness, Cooper did testify concerning his communications with Friedman. That testimony is substantially as follows:

"Q. [by government counsel] Now, sir, after an event occurred at which a transcript of Phil Silvers was found in the courtroom, did there come a time when Mr. Friedman said to you, in substance or effect, that he wanted to make a full disclosure to the court about the transcript, and

---

4. When called as a surrebuttal witness by Friedman, Morgan did testify to a conversation he had with Friedman in a courthouse during the Friars Club trial. It concerned the discovery of the transcripts; Friedman told Morgan, in effect, that he (Friedman) wanted to talk to Judge Gray about the transcripts. This was not a privileged conversation. Morgan was Jacobs' lawyer, not Friedman's. And even if the rule of Hunydee v. United States, 9 Cir., 1965, 355 F.2d 183, 185, were deemed applicable, the facts of the conversation negate confidentiality. Morgan stated: "And who was within earshot I don't know. But it wasn't in the sense that it was a conference."

you replied, in substance, or effect, 'No. Don't do anything rash. Sit tight,' or words to that effect?

A. I have no recollection of any such conversation."

\* \* \* \* \* \*

"Q. Mr. Cooper, heretofore you testified, I believe, about going to Mr. Morgan to get four transcripts. \* \* \* Now, sir, from what person did you receive information that led you to Mr. Morgan, as you say?

\* \* \* \* \* \*

A. From Mr. Friedman."

\* \* \* \* \* \*

"Q. Could you give us your best recollection of the conversation between you and Mr. Friedman upon which you based this request, sir?

A. I don't remember it word for word, but the substance, as I recall, was Mr. Friedman said, in substance, 'Grant, I think Marshall has some of those Grand Jury transcripts,' or 'some of the transcripts.' \* \* \* \*"

As we have pointed out, the attorney-client privilege does not extend to communications between attorney and client where the purpose of that communication is to further the crime charged in the indictment or future intended illegality. Clark v. United States, 1933, 289 U.S. 1, 15, 53 S.Ct. 465, 77 L.Ed. 993; Hett v. United States, supra; United States v. Hoffa, 6 Cir., 1965, 349 F.2d 20, 37; 8 Wigmore, Evidence § 2298 (McNaughton rev. 1961); 3 L. Orfield, Criminal Procedure Under the Federal Rules § 26:529 (1966). Future intended illegality or furtherance of present, continuing illegality need not be shown beyond a reasonable doubt before the privilege can be defeated; it suffices to make out a prima facie case. Clark v. United States, supra, 289 U.S. at 15, 53 S.Ct. at 469; United States v. Bob, 2 Cir., 1939, 106 F.2d 37, 40; Unit-

ed States v. Weinberg, 3 Cir., 1955, 226 F.2d 161, 172; Pollock v. United States, 5 Cir., 1953, 202 F.2d 281, 286; 3 L. Orfield, supra, § 26:529 at 880. And compare the Advisory Committee's Note to Rule 503(d) (1), Proposed Rules of Evidence for the United States District Courts (Revised Draft, March 1971). The attorney need not himself be aware of the illegality involved; it is enough that the communication furthered, or was intended by the client to further, that illegality. Clark v. United States, supra, 289 U.S. at 15, 53 S.Ct. 465; United States v. Hoffa, supra, 349 F.2d at 38.

The last two of the three quoted excerpts from Cooper's testimony fall within the intended illegality exception. The illegality in this case was precisely the continuing misuse of the grand jury transcripts charged in the indictment. Arguably the first of the three excerpts also falls within the exception. If it does not, however, its inclusion in evidence constitutes only harmless error, in light of Cooper's response to the question and in light of the last two excerpts. Rule 52(a), F.R.Crim.P.

Baird's testimony was considerably more extensive than that of Morgan or Cooper. We have read it carefully. We see no need to discuss it in detail, for we think the intended illegality exception to the privilege applies to Baird's testimony, just as it does to Cooper's.

Finally, Friedman claims that his attorney-client privilege was violated because his attorneys "had been called before the Grand Jury which returned the indictment" in this case. To call a client's attorney to the stand either at trial or before a grand jury does not, by itself, violate the client's privilege. The privilege is violated only if the attorney is required to testify to the contents of confidential communications between him and his client. Friedman has not claimed that any such testimony was required before the grand jury. We decline to find error on the basis of nothing more than general allegations.

F. *Jacobs' contention that the trial judge's instructions concerning "government property" were incorrect.*

■ The judge gave the following instructions to the jury:

"So, obtaining, or possessing, or disclosing, or using any Grand Jury transcript not yet released by court order, by anyone other than a Government attorney or a court reporter, or an authorized aide to either, is a violation of Rule 6(e) [of the F.R.Crim. P.].

\* \* \* \* \* \*

I have heretofore instructed you as to the effect and the meaning of Rule 6(e), Criminal Rule 6(e) and the secrecy surrounding Grand Jury transcripts unless and until they are authorized to be released by order of a court. The effect of the said Rule is that the information contained in Grand Jury transcripts, i. e., the information as to the questions asked and answers given at a particular session or sessions of the Grand Jury, are the property of the United States and remain its property alone unless and until the release of said information is ordered by a court order. Said information is Government property regardless of who may be said to own the particular sheets of paper or tapes on which said information is recorded."

Jacobs claims that giving this instruction was error. He argues that the issue whether the transcripts were government property is an element of the offenses charged in Counts 15 and 16 (18 U.S.C. § 641, receiving stolen government property), that that issue is therefore for the jury, and that the judge's instruction effectively directed a verdict on that issue.[5] We recently answered a similar argument in United States v. Jackson, 9 Cir., 1970, 436 F.2d 39.

In *Jackson*, the trial judge, on the basis of uncontradicted evidence, told the jury that the particular property there involved was government property. Here, the judge stated only a legal principle; he left it to the jury to apply it to the evidence. Jacobs does not argue that, as a matter of law, the information contained in the transcripts was not government property.

Jacobs contends that the trial judge should have instructed the jury to acquit on the section 641 charges unless the jury was convinced that Jacobs knew that the transcripts had not been released by court order and were therefore government property. Jacobs cites Morissette v. United States, 1952, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288, as support. Morissette did not claim, as Jacobs does, that he was ignorant of the applicable law. Rather, he claimed that the government property he took appeared abandoned, that he reasonably believed it was abandoned, that the trial judge should have given him a chance to prove he believed the property was abandoned, and that the jury should have been instructed that they could so find. See, *id.* at 249, 72 S.Ct. 240. Nothing comparable appeared here. Jacobs *did* attempt to prove that he did not know the transcripts were unlawfully taken government property. And the trial judge *did* instruct the jury that they could so find. The judge also instructed the jury that a man is rebuttably presumed to know what the law forbids. That instruction did not prevent the jury from considering Jacobs' claims that he did not know the transcripts were stolen. The evil present in *Morissette* is not present here. Compare Baker v. United States, 9 Cir., 1962, 310 F. 2d 924, 930.

---

5. Jacobs also claims that the above quoted instructions amounted to a directed verdict of guilty on Count 6, charging Jacobs with contempt of court (18 U.S.C. § 401) for violating Rule 6(e), F.R.Crim.P. Because of our disposition of the contempt counts, see *infra*, we need not consider this claim.

### G. *Friedman's contentions that the trial judge erred in refusing Friedman's clarifying instructions on obstruction of justice.*

 Friedman requested two instructions concerning Count 19 (18 U.S. C. § 1503), which charged him with corruptly endeavoring to influence prospective witness Corenson. In essence, the requested instructions required that, in order to convict, the jury must find (1) that the representations made by Friedman to Corenson were actually false, (2) that Friedman actually believed them to be false, (3) that Friedman's purpose was to attempt to influence Corenson to testify falsely, and (4) that an innocent interview with a prospective witness is not an obstruction of justice. The court declined to give the instructions.

We find no error. The instructions given adequately made points (1), (2), and (3). Point (4) was not expressly made, but was implicit in the instructions given, particularly in light of the general instruction requiring every element to be proven beyond a reasonable doubt. "A court is not bound to accept the language of a requested instruction proffered by counsel nor to give a proposed requested instruction if the court gives it in substance. Agnew v. United States, 165 U.S. 36, 17 S.Ct. 235, 41 L. Ed. 624." Amsler v. United States, 9 Cir., 1967, 381 F.2d 37, 52. Accord, Charron v. United States, 9 Cir., 1969, 412 F.2d 657, 660; Rivers v. United States, 9 Cir., 1966, 368 F.2d 362, 364.

### H. *Friedman's claim that he was improperly called before the grand jury.*

 ' Friedman was called as a witness before the grand jury that subsequently returned the indictment in this case. While before the grand jury, Friedman exercised his privilege not to answer certain questions put to him. He did answer other questions. Before the trial began, Friedman moved to dismiss the indictment on the grounds that, as a potential defendant, he should not have been called before the grand jury and that, by "forcing" him to exercise his privilege, the government prejudiced him before the grand jury.

Denial of the motion was proper. Requiring a potential defendant to appear before the grand jury that may subsequently indict him does not violate his privilege against compulsory self-incrimination. United States v. Wolfson, 2 Cir., 1968, 405 F.2d 779, 784–785; Kitchell v. United States, 1 Cir., 1966, 354 F.2d 715, 720; United States v. Winter, 2 Cir., 1965, 348 F.2d 204, 207–208, and cases cited. *Contra,* Jones v. United States, 1964, 119 U.S.App.D.C. 284, 342 F.2d 863, 867–870. Like the appellants in Wolfson, Kitchell, and Winter, Friedman was fully advised of his privilege to remain silent. He exercised it when he felt the questions warranted, and he answered other questions. His exercise of the privilege did not improperly prejudice him, and he was not improperly coerced.

### I. *Other contentions.*

Jacobs contends that the trial judge was antagonistic to him and to his counsel, thereby depriving Jacobs of a fair trial. The contention is unsupported by the record.

Jacobs also contends that the judge denied him a fair trial by improperly limiting cross-examination of government witnesses. We have read the relevant excerpts from the record. The trial judge did not abuse his considerable discretion in limiting cross-examination.

 Friedman claims that government counsel's closing argument to the jury was prejudicial misconduct because it referred to extrajudicial statements of the witnesses that were not in evidence. If there was misconduct, it was not prejudicial to Friedman. Although the witness' statements were not in evidence, defense counsel referred to them repeatedly throughout the trial. Brief mention of those statements in the government's closing summation was not reversible error. See Tenorio v. United States, 9 Cir., 1968, 390 F.2d 96, 98–99; cf. United States v. Cozzetti, 9 Cir., 1971, 441 F.2d 344.

Finally, both Friedman and Jacobs raise numerous objections to the contempt counts, Counts 5 (Friedman) and 6 (Jacobs). They argue (1) that Friedman and Jacobs did not violate Rule 6(e), F.R.Crim.P., (2) that even if they did, Rule 6(e) is not a "writ, process, order, rule, decree, or command" within the meaning of the contempt statute, 18 U.S.C. § 401, and (3) that even if it is, contempt of court under section 401 is not "any offense against the United States" within the meaning of the conspiracy statute, 18 U.S.C. § 371, and that there is no such offense as a conspiracy to commit a contempt of court. These questions we need not decide. Each appellant was sentenced to concurrent terms, Jacobs on 5 counts and Friedman on 6 counts. The objections summarized here would affect at most one count for each appellant. We exercise our discretion not to consider those objections. See, e. g., United States v. Wong, 9 Cir., 1970, 425 F.2d 1077, 1078–1079; Gabriel v. United States, 9 Cir., 1966, 366 F.2d 726, 727.

Affirmed.