**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Michael Curtis KEYS, Defendant– Appellant.**

No. 93–50281.

United States Court of Appeals, Ninth Circuit.

Argued and Submission Deferred March 10, 1994.

Resubmitted July 28, 1994.*

Decided Sept. 29, 1995.

---

* We recognized at the time of argument that the disposition of this case might turn on our then

pending en banc decision in *United States v. Gaudin,* 997 F.2d 1267 (9th Cir.1993), discussed below. Our en banc decision came down subsequently, at 28 F.3d 943 (9th Cir.1994), but the case was not completed, because the Supreme Court granted a writ of certiorari. The Supreme Court issued its decision June 19, 1995, in *United States v. Gaudin,* —— U.S. ——, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), so we then submitted the case at bar for decision.

Errol H. Stambler, Los Angeles, California, for the defendant-appellant.

Stefan D. Stein, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

Before WALLACE, Chief Judge, FARRIS and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge:

Among the issues raised in this case are what a lawyer can do when she feels her client presents a danger in court, whether she must be relieved as counsel, and whether in a perjury prosecution the element of materiality must be submitted to the jury. Issues

of invited error and sentencing guidelines are also raised.

## I. Facts

Keys was serving time in federal prison for armed bank robbery. A former DEA agent was on trial for conspiracy and other crimes. Another prisoner testified for the prosecution pursuant to a plea bargain. The former DEA agent called Keys as a witness to impeach the other prisoner. Keys testified that while he and the prosecution witness had shared a cell, the witness told him that he was willing to lie for the government against the former DEA agent in exchange for leniency for himself.

Keys had sent a letter to the former DEA agent, who was being held in the same facility. He hid the letter among some magazines he asked a guard to deliver to the former DEA agent. A letter smuggled past prison officials to another prisoner is called a "kite." The cryptic letter lends itself to the inference that Keys conspired with the former DEA agent to lie for him at trial. Here is the text of the letter:

Hey G.,

I've got everything covered on my end and I'm ready whenever the time is right. I hope that I can really make a difference and you come out on top. Let me know how long you anticipate your thing to last, so I can figure out how long I'll be here. I'm trying to stay as long as I possibly can and try to get a lot done while I'm here. I heard that R.R. left Fri. and he's in Okla. right now. I'm also trying to get a few things from the commissary but they only let us order two cosmetics items a week. If you can hook it up right away I need you to have somebody send this girl some money upstairs, so I can have her get me everything I need from the commissary. It don't have to be nothing but twenty or fifty dollars.

That guy,

P.S. Here's her name and number: Jeanna Carson—Reg. No. 92373–012.

The guard found and photocopied the letter, and provided the copy to his supervisor, but Keys did not know that. On cross examination of Keys, the prosecutor asked him about the kite, and Keys denied sending it:

Q. Now in addition to talking through the doors to Mr. Garcia, you have also communicated with him by sending him kites, isn't that right?

A. No.

Q. When I say kites I include letters.

A. No.

Q. Handwritten letters?

A. No.

Q. Typed Letters?

A. No.

Q. Notes?

A. No.

Q. Typed notes?

A. No.

Q. Isn't it a fact that just last Monday, on February 11 of this year, you sent a kite to Mr. Garcia?

A. No.

MS. KARLIN: Your Honor, may I approach the clerk with an exhibit that has been marked as 2000–E?

THE COURT: Certainly.

THE CLERK: Government's exhibit number 2000–E is marked for identification and is before the witness.

(Witness read document.)

Q. (BY MS. KARLIN) Mr. Keys, you have got exhibit 2000–E in front of you, don't you?

A. Yes, plaintiff's exhibit.

Q. Pardon?

A. Yes.

Q. And that is a letter that you typed to Mr. Garcia on February 11, 1991, isn't that correct?

A. No.

Q. Isn't that a letter that you attempted—that you sent to Mr. Garcia on February 11, 1991?

A. No, it is not.

Q. Isn't this a letter that you hid in some magazines that you asked a prison guard to deliver to Mr. Garcia at the MDC on February 11, 1991?

A. No, it is not.

Q. Isn't it a fact that at approximately 7:45 p.m., officer Rodney Montgomery, was asked by you to pass some magazines to Darnell Garcia?

A. No. I believe that you must be talking about my cell partner.

The government used this testimony of his about the kite as the basis for a perjury indictment against Keys. The case at bar is his appeal from his conviction and sentence in this perjury case.

In the middle of trial, Keys said something to his lawyer, Elsa Leyva, which caused her to feel that safety in the courtroom might be in danger. She told the U.S. Marshals to stay alert during trial. Ms. Leyva has carefully avoided disclosing what her client said to her, evidently in order to preserve Keys' attorney-client privilege if it applies. She disclosed only her subjective belief subsequent to whatever her client said. Here is the extent of what she revealed:

On Wednesday, January 8, 1992, I had a conversation with my client in the U.S. Marshal's lockup. Based on that conversation, I believed that my personal safety and the safety of court personnel might be in danger. I requested that the U.S. Marshals in the courtroom be advised and be extra alert during trial. On Thursday, January 9, 1992, I had a conversation with the court in chambers that revealed my request to the U.S. Marshal's service.

The district judge held extensive hearings with counsel, without and then with Keys present, to decide how to proceed. The judge felt that Keys had to be advised of what was going on.

Ms. Leyva moved to withdraw as counsel. She said, "at this time, I cannot continue to represent Mr. Keys. I am not able to represent him effectively and with undivided loyalty. To continue to represent him is to provide him ineffective assistance of counsel at a time when he most needs and deserves the effective assistance of counsel." The district court denied Ms. Leyva's motion to be relieved as counsel.

## II. Analysis

### A. Counsel's Motion to Withdraw.

Keys argues that the district court should have substituted new counsel for Ms. Leyva and granted a mistrial after Ms. Leyva advised the marshals of a potential security concern. The district court held a hearing to consider Ms. Leyva's motion to be relieved as counsel, in which Keys, after consultation with another attorney, joined.

The judge carefully considered whether Ms. Leyva's representation had been impaired because she had been put in fear by something her client had said. He concluded that she was doing an excellent job defending Keys:

But as far as I'm concerned, everything I have seen done by defense counsel has been, I suppose you could dramatically say, in the highest tradition. I have no doubt that she has given her all on this and has fought the fight for this client, up until this day, with all her of heart and mind. And I just simply—that should just be made clear. That's my very, very, clear impression. This is not a case where the court thinks that the lawyer has kind of goofed off and fiddled around and not gotten to it. In no way is that this case. This is a dedicated defense lawyer who is running in—has run into a situation which is, I suppose, inevitable on occasions but through no doing of her own.

The judge expressed the view that if there were a total breakdown in communication between lawyer and client, he would have to grant a mistrial. He thought that Ms. Leyva's concern about safety was legitimate, especially because Keys and other witnesses were from Marion Penitentiary, the maximum security federal institution. But based on his observations, he did not think communication had totally broken down. The judge noted that "defense lawyers are used to these things in minor degrees." Ms. Leyva conceded that she had, subsequent to Keys' statement which put her in fear, spoken to him in a locked room at the jail, whispered to him in court, sat close to him, and maintained a good relationship with him. She was concerned that this relationship would deterio-

rate after Keys found out she had advised the marshals to stay alert, but the judge concluded that Keys was entitled to know, in case he had a subsequent challenge to her representation.

After trial, in the order denying the motion for new trial, the judge found that Ms. Leyva had discussed strategy with Keys, prepared him to testify, and otherwise vigorously defended the case. The judge specifically found that "Leyva and Keys conferred and communicated with each other on several occasions after the motion for substitution of attorney was denied." The judge also denied the motion, because under the circumstances, it would enable the defendant to get a mistrial by making threats in the middle of trial. "I do not believe that it is appropriate to grant a mistrial in a situation where the fault lies solely within the conduct of the defendant."

■■■■ In *United States v. Gonzalez,* 800 F.2d 895, 898 (9th Cir.1986), we said that the factors relevant to whether the district court abused its discretion in denying a motion for substitution of counsel were "(1) timeliness of the motion; (2) adequacy of the court's inquiry into the defendant's complaint; and (3) whether the conflict between the defendant and his attorney was so great that it resulted in a total lack of communication preventing an adequate defense." In this context, a motion is untimely if "substitution would delay the proceedings." *See United States v. Torres–Rodriguez,* 930 F.2d 1375, 1380–81 (9th Cir.1991). Granting Keys' motion would have necessitated a mistrial to allow replacement counsel an opportunity to prepare. The motion was untimely. *See Gonzalez,* 800 F.2d at 898–99 (motion made on second day of trial untimely). No question has been raised concerning adequacy of the court's thorough and careful inquiry. The judge expressly found that there was not a "total lack of communication preventing an adequate defense," and the record supports that finding. The judge properly considered two additional factors, that defense counsel face disquieting concerns about their clients from time to time, and that substituting counsel too readily in the middle of trial would empower criminal defendants to obtain mistrials

by their own wrongdoing. *See United States v. Roston,* 986 F.2d 1287, 1292 (9th Cir.1993) ("any breakdown in communication between [defendant] and his current counsel was entirely [defendant's] fault."). We review denial of the motion for withdrawal and substitution of counsel for abuse of discretion, *id.,* and conclude that the district judge did not abuse his discretion.

■■■■ Keys argues that Ms. Leyva was obligated to withdraw, and the court should have allowed her to withdraw, because she was ethically obligated to keep her client "reasonably informed about significant developments," Cal.R.Prof.Conduct 3–500, her "mental condition renders it unreasonably difficult to carry out the employment effectively," Cal.R.Prof.Conduct 3–700(B), and to "maintain inviolate the confidence, and at every peril to himself, to preserve the secrets of his client." Cal.Bus. & Prof.Code § 6068(e). Ms. Leyva cannot be faulted for not withdrawing. She attempted to withdraw, and the district judge would not allow it. The district judge's exercise of discretion is evaluated by federal law standards, as set out above. Ms. Leyva did not disclose what Keys said to her. To the extent that her disclosure intimated that he had said something which suggested a security risk, his "announced plans to engage in future criminal conduct" would be unprotected by the attorney-client privilege. *Nix v. Whiteside,* 475 U.S. 157, 174, 106 S.Ct. 988, 998, 89 L.Ed.2d 123 (1986); *United States v. Friedman,* 445 F.2d 1076, 1085 (9th Cir.1971). We need not decide whether failure to disclose to Keys the communications that Ms. Leyva made to the marshals would have entitled Keys to any relief, because after the colloquy between counsel and the court about whether Keys should be told, he was told.

■■■■ Many lawyers would feel less enthusiastic about keeping their clients out of prison if the clients put them in fear of their physical safety. Nevertheless, many criminal defendants are, in fact, dangerous criminals. Ms. Leyva properly advised the court of a potential danger, and continued, as the district court found, to perform effectively as Keys' advocate, regardless of her feelings. The defendant is entitled to no more than

this. A criminal defendant is not entitled to an attorney who likes and feels comfortable with him. *See Morris v. Slappy,* 461 U.S. 1, 12–14, 103 S.Ct. 1610, 1617, 75 L.Ed.2d 610 (1983) (no right to "a meaningful attorney-client relationship" or "rapport"); *United States v. Schaff,* 948 F.2d 501, 505 (9th Cir. 1991) (no right to a "meaningful relationship"). A defendant's right to the effective assistance of counsel does not entitle him to a friend. Nor is the client entitled, when he himself has put his lawyer in fear, to a lawyer who feels no fear. A lawyer can effectively represent a client she fears and dislikes; that has always been part of a lawyer's calling, necessary to preserving justice for all. The defendant is constitutionally entitled to effective representation of counsel, nothing more, and Keys received that entitlement.

*B. Materiality.*

Counsel for both sides proposed, and the court gave, an instruction correct under the law as it then stood:

COURT'S INSTRUCTION NO. 16

The defendant is charged in Count One of the indictment with having made a false declaration in violation of Section 1623 of Title 18 of the United States Code. In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant testified under oath before a court of the United States;

Second, the testimony was false; and

Third, the defendant knew that the testimony was false.

This instruction was based on the Ninth Circuit model instruction for false declarations.

The instruction did not submit the issue of the materiality of the false testimony to the jury as one of the elements which the government had to prove beyond a reasonable doubt. Yet the statute criminalizes only such false testimony as is material. The statute uses the language "Whoever under oath ... makes any false *material* declaration...." 18 U.S.C. § 1623(a). The instruction did not require the jury to find materiality beyond a reasonable doubt.

Our model instruction, in the Ninth Circuit Manual of Model Criminal Jury Instructions at § 8.29C, was based on established Ninth Circuit law. We had held in *United States v. Clark,* 918 F.2d 843, 845 (9th Cir.1990), that "materiality is an issue of law for the court to decide." We followed the rule set out by the Supreme Court in *Sinclair v. United States,* 279 U.S. 263, 298, 49 S.Ct. 268, 273, 73 L.Ed. 692 (1929).

■ The instruction has, subsequent to the trial in the case at bar, turned out to be erroneous. So is the model form. In a perjury prosecution under 18 U.S.C. § 1623(a), materiality is an element of the crime and must be submitted to the jury. In *United States v. Gaudin,* 28 F.3d 943 (9th Cir.1994) (en banc), we held that the element of materiality in a prosecution for making false statements on loan documents under 18 U.S.C. § 1001 is a question of fact for the jury. The Supreme Court affirmed, in *United States v. Gaudin,* —— U.S. ——, 115 S.Ct. 2310, 132 L.Ed.2d 444 (U.S.1995) (No. 94–514). The *ratio decidendi* of the Supreme Court decision requires that *Gaudin* be extended to perjury prosecutions under 18 U.S.C. § 1623(a), not limited to 18 U.S.C. § 1001 cases.

In *Gaudin,* Justice Scalia writing for a unanimous Court laid down a syllogism:

The Constitution gives a criminal defendant the right to demand that a jury find him guilty of all the elements of the crime with which he is charged; one of the elements in the present case is materiality; respondent therefore had a right to have the jury decide materiality.

*Id.,* —— U.S. at ——, 115 S.Ct. at 2314. This syllogism applies with equal force to the perjury statute at issue in this case, 18 U.S.C. § 1623. Section 1623(a) provides:

Whoever under oath (or in any declaration, certification, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false *material*

declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1623(a) (emphasis added). Materiality is an element of perjury under section 1623, so the defendant is entitled to have a jury decide whether his false statement was material.

 Keys' attorney, quite properly under existing law, joined in the request for the instruction which the court gave. Generally, a defendant is not entitled to relief because of an error in a jury instruction the defendant joined in proposing, because the error is invited. "Where the defendant himself proposes the jury instruction he later challenges on appeal, we deny review under the invited error doctrine." *United States v. Baldwin,* 987 F.2d 1432, 1437 (9th Cir.1993). In this case, the law changed after trial. Review of invited error in an instruction may be appropriate "when the issue arises by virtue of a change in law while the appeal is pending." *United States v. Mkhsian,* 5 F.3d 1306, 1310 (9th Cir.1993). We do not require defense counsel to preserve an objection in the face of "a solid wall of circuit court authority, including our own." *United States v. Scott,* 425 F.2d 55, 57 (9th Cir.1970) (en banc). Review for reversible error is not conditional upon an objection which plainly would have been "futile." *Guam v. Yang,* 850 F.2d 507, 512 n. 8 (9th Cir.1988) (en banc).

 Although the *Mkhsian* change of law exception permits review of invited error, it does not require it. Review of invited error, even where permitted, is discretionary. *Cf. United States v. Kimball,* 896 F.2d 1218, 1219 (9th Cir.1990). *Mkhsian* eliminates the effect of the defense invitation to make the error, because the law which rendered the invitation mistaken came down after trial. This nevertheless leaves the trial judge in the position of having acted without objection and in compliance with existing law. It would be unreasonable to make the judgment more vulnerable to challenge where the trial judge so acted pursuant to defense request, than where he acted without the defense leading him into error. Once the legal effect of the invitation to err disappears because of the good excuse of a subsequent change of law, then the error falls within the "single category" of "forfeited-but reversible error," that is, "questions which had not previously been specifically urged." *United States v. Olano,* ── U.S. ──, ──, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993).

The Supreme Court recently clarified what it characterized as limitations on appellate authority to correct error not brought to the attention of the trial court. Appellate authority is constrained by Federal Rule of Criminal Procedure 52, to "plain errors . . . affecting substantial rights":

> Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

Fed.R.Crim.P. 52(b). The Court identified three criteria, each of which is a "limitation on appellate authority": (1) there must be error; (2) the error must be "plain"; (3) the error must "affect substantial rights." *Olano,* ── U.S. at ──── ──, 113 S.Ct. at 1777–78.

 We have already identified the instruction as error. Ordinarily for error to be "plain," it must be clear and obvious, but the Court did not decide whether this standard applies in "the special case where the error was unclear at the time of trial but becomes clear on appeal because the applicable law has been clarified." *Id.* at ──, 113 S.Ct. at 1777. The case at bar is that "special case." The error was not "plain" when made. We therefore cannot review it at all, unless an error not "plain" at trial, but "plain" because of a subsequent change in the law, can properly be treated as "plain" for purposes of Rule 52.

 Plainness is a prerequisite to reviewability, but does not compel review. Review remains discretionary. Because of the function which plainness performs, a necessary but not sufficient condition for review, we conclude that error which becomes plain

because of post-trial change of law is "plain" for purposes of Rule 52.

Defense counsel had good reason not to ask for an instruction different from what established precedent required. From the defense point of view, it would be unfair to deny review because the error was not plain at the time of trial, and requiring objection to escape the plain error bar to review would burden trial courts with meritless objections. *Cf. Guam v. Yang,* 850 F.2d at 512 n. 8; *Scott,* 425 F.2d at 57. An error by virtue only of a post-trial change of law could never be "plain" at the time of trial.

The court, prosecution, witnesses, and jury also have a great deal invested in the trial. The judge did nothing wrong by following established precedent. We should not review the error as though it had been brought to the judge's attention, and in the face of contrary law, the judge went the wrong way. *Cf. Guam v. Yang,* 850 F.2d at 512 n. 8 (trial court used a Devitt & Blackmar instruction contrary to a Guam statute, relying on our unpublished affirmance of another judgment based on the Devitt & Blackmar instruction). The error might not have mattered. It is unfair to burden society with retrial, and release of criminals where evidence has disappeared during pendency of appeal, where trials were conducted fairly according to law, subsequent law made some trial decision incorrect, and the error did not matter.

Other circuits have generally provided for discretionary review of error, not plain at trial, which becomes plain pending review because of a change in the law. *Cf. United States v. Retos,* 25 F.3d 1220, 1230 (3d Cir. 1994) (plainness viewed from perspective of law as it stands at the time of appellate review, but court only reverses if all *Olano* factors are met); *United States v. Viola,* 35 F.3d 37, 41–42 (2d Cir.1994) (plainness viewed from perspective of law as it stands at the time of trial, but adding that if the current law at time of appellate review shows plain error, then the burden shifts to the government to demonstrate lack of prejudice); *United States v. Washington,* 12 F.3d 1128, 1138 (D.C.Cir.1994) (law viewed at the time of trial but then applying separate "supervening-decision" analysis); *United States*

*v. Calverley,* 37 F.3d 160, 162–63 (5th Cir. 1994) (en banc) (plainness viewed from perspective of law as it stands at the time of the trial, but not specifically addressing issue). Our decision permitting review as "plain error" of error not plain at trial but which becomes plain pending review avoids intercircuit conflict.

■ The third *Olano* prerequisite to reviewability of error not objected to is that it affect substantial rights. "In most cases, the Court of Appeals cannot correct the forfeited error unless the defendant shows that the error was prejudicial." *Olano,* —— U.S. at ——, 113 S.Ct. at 1778. A "burden-shifting" to the defendant "is dictated" by the language of Rule 52(b). *Id.* "Normally, although perhaps not in every case, the defendant must make a specific showing of prejudice to satisfy the 'affecting substantial rights' prong of Rule 52(b)." *Id.* The Court left open the question of whether a category exists, of "errors that can be corrected regardless of their effect on the outcome." *Id.* Thus whether "structural errors" need not satisfy the "affecting substantial rights" prerequisite is unsettled. We do not resolve the issue here. We assume, without deciding, that failure to instruct on materiality was "structural," and that such an error can be corrected by an appellate court regardless of whether the defendant demonstrates prejudice.

Here is where we are so far in applying *Olano.* There was error, because subsequent to trial, materiality became a jury issue. The error is plain, for purposes of correctability, because it became plain pending review. We assume without deciding that failure to instruct on materiality is "structural," so appellant need not establish prejudice.

■ *Olano* treats these three prerequisites as necessary but not sufficient to empower a court of appeals to correct a trial error. Even where all three prerequisites are established, whether to correct the error remains discretionary with the Court of Appeals.

Rule 52(b) is permissive not mandatory. If the forfeited error is "plain" and "affects

substantial rights," the Court of Appeals has authority to order correction, but is not required to do so.

*Olano,* —— U.S. at ——, 113 S.Ct. at 1778.

■ The Court has instructed us on the criteria for exercise of this discretion. We should correct error which caused a "miscarriage of justice," that is, conviction of an innocent person. Aside from preventing such miscarriages of justice, the standard the Court requires us to apply is whether "the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* at ——, 113 S.Ct. at 1779, quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936). An error may meet the second criterion independently of whether it meets the first. "Conversely, a plain error affecting substantial rights does not, without more, satisfy the *Atkinson* standard, for otherwise the discretion afforded by Rule 52(b) would be illusory." *Olano,* —— U.S. at ——, 113 S.Ct. at 1779.

■ This statement by the Court necessarily implies that even if error is "structural," and even if "structural error" is presumed to affect substantial rights for purposes of the third prerequisite to correctability, a Court of Appeals nevertheless should not reverse because of structural error not raised at trial, unless the error "seriously affects the fairness, integrity or public reputation of judicial proceedings." The argument that any structural error must necessarily, by virtue of being "structural," so affect judicial proceedings, cannot withstand the Court's careful preservation in the "Conversely ..." sentence of appellate discretion *not* to correct all plain errors affecting substantial rights.

The *Atkinson–Olano* standard requires a case by case exercise of discretion. In *Gaudin,* we held that withdrawing an element of the crime from the jury meets the "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings" standard, but we took note of the "serious factual question" regarding the withdrawn element in that case. *United States v. Gaudin,* 28 F.3d 943, 952 (9th Cir.1994) (en banc). Under *Olano,* it is not possible to substitute a mechanical rule for the exercise of discretion case by case. Even assuming that a forfeited error is "plain" and "affects substantial rights," so that the Court of Appeals has authority to order correction, nevertheless that appellate court is not required to do so. *Olano,* —— U.S. at ——, 113 S.Ct. at 1778. Unlike *Gaudin,* the case at bar did not present a "serious factual question" regarding the omitted element.

■ A statement is material "if it has a natural tendency to influence, or was capable of influencing, the decision of the decisionmaking body to which it was addressed." *Clark,* 918 F.2d at 846 (internal quotation omitted). A statement may be material even if it is relevant only to a subsidiary issue under consideration. *Id.* Materiality of Keys' false testimony was not at issue, and it is hard to see how it could have been. Keys was testifying to show the jury that the prosecution witness was a liar. The prosecutor asked the questions about the kite to show that Keys was a liar. Keys denied sending the kite to refute the prosecutor's implication that he was lying, in order to bolster his attack on the prosecution witness. Keys could have no doubt, when he testified, that it might matter to the jury whether he had sent the kite. Because there was no serious factual question regarding the element on which the court, on defendant's invitation, did not instruct, the error could not seriously affect the fairness, integrity or public reputation of judicial proceedings. In the circumstance of an error which did not matter, and was not error when made, reversal of the conviction rather than affirmance would impair the fairness, integrity and public reputation of judicial proceedings. It is unfair to vacate the conviction of a guilty man because of an error which he invited and which did not matter in his trial. The integrity of our judicial system as a means of distinguishing the innocent from the guilty, and its reputation as a fair and reliable system, would be impaired by vacating a guilty man's conviction based on immaterial error.

Though this discussion resembles harmless error analysis, it goes to the exercise of discretion, rather than correctability under

the "affects substantial rights" prerequisite. There may be errors otherwise harmless which, if they can get past the "affects substantial rights" prerequisite by being structural, do seriously affect the fairness, integrity or public reputation of judicial proceedings. This one does not. If Keys were to get his conviction reversed because the judge did not instruct the jury to acquit unless it thought it mattered whether he lied about sending the kite, his reversal would convert his initial trial into a game of chance.

### C. Standard of Proof.

When the district court made its express finding of fact that Keys' lie was material, the judge did not expressly recite that the fact was proved beyond a reasonable doubt. Keys now argues that the case should be reversed on this ground, but he did not object at trial, ask the court what standard of proof it applied, ask the court to apply the beyond a reasonable doubt standard, or otherwise raise the issue. Although it is possible that the court applied a lower standard of proof, see United States v. Martinez, 855 F.2d 621 (9th Cir.1988), we decline to exercise our discretion to review. Because the materiality of Keys' lie about the kite was not a "serious factual question," the quantum of proof of materiality did not matter. Any error, therefore, in selecting the appropriate standard of proof for materiality does not "seriously affect the fairness, integrity or public reputation of judicial proceedings." Olano, —— U.S. at ——, 113 S.Ct. at 1778.

### D. Sentencing.

Keys received a consecutive sentence. That meant that he would serve his five years on his perjury conviction after he completed his twenty year sentence for armed bank robbery. He argues that he should have received a concurrent sentence instead. That would have the practical effect that any time remaining on his bank robbery sentence would count against his perjury sentence, so that he would do no additional time, or at least less than an additional five years, depending on how the release dates worked out.

He argues that the Sentencing Guidelines required consecutive sentencing, but a controlling statute provided for judicial discretion whether to impose consecutive or concurrent sentences, so the judge sentenced under an invalid guideline. The statute, 18 U.S.C. § 3584(a), provides in pertinent part: "if a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms *may* run concurrently or consecutively...." The Sentencing Guideline, U.S.S.G. § 5G1.3(a), says "*shall* be imposed to run consecutively." The district judge said that he understood that the sentences were to be consecutive unless he exercised his discretion to depart downward. The district judge recognized that he had authority to depart downward and to order that the sentences be served concurrently, but he found no reason to do so. This was proper and unreviewable under United States v. Lail, 963 F.2d 263 (9th Cir.1992).

Keys also argues that his sentence was too harsh, because it was affected by what the former DEA agent did, not just what he did.

Keys is correct in his assertion that perjury may be sentenced more or less harshly depending on the conduct of the defendant in the case in which the perjury is committed. Perjury has a base offense level of 12. U.S.S.G. § 2J1.3. Section 2J1.3(c)(1) provides: "If the offense involved perjury or subornation of perjury in respect to a criminal offense, apply § 2X3.1 (Accessory After the Fact) in respect to that criminal offense, if the resulting offense level is greater than that determined above." U.S.S.G. § 2X3.1 provides that for accessory after the fact, the base level is "6 levels lower than the offense level for the underlying offense, but in no event less than 4, or more than 30." These provisions yielded an offense level of 26, not the base level of twelve. The guideline range was 120–150 months, but the statutory maximum for the perjury offense was five years, 18 U.S.C. § 1623(a), so Keys was sentenced to serve five years.

Keys cites no authority for the proposition that the sentencing scheme was inappropriate in this respect. We see nothing

wrong with it. Perjury is a serious crime in any circumstance, but it is considerably more serious in a major felony prosecution than in, say, a minor misdemeanor. The increased sentence is not a fortuitous result of the seriousness of the other persons' conduct who is the subject of the trial in which the perjury is committed. The perjurer's conduct is itself more gravely wrongful if the proceeding in which it occurred had greater stakes.

AFFIRMED.